UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORTH VENTURE PARTNERS, LLC,<br><br>  Plaintiff,<br><br>  v.<br><br>VOCUS, INC.,<br><br>  Defendant. | Case No. 14-cv-00337-RS   (MEJ)<br><br>**DISCOVERY ORDER**<br>Re: Dkt. No. 108 |

## INTRODUCTION

This is a breach of contract action in which Plaintiff North Venture Partners, LLC ("NVP") alleges Defendant Vocus, Inc. ("Vocus") failed to make payments as required by their asset purchase agreement (the "Agreement"). Second Am. Compl. ("SAC"), Dkt. No. 37; *see id.*, Ex. A ("Agmt."). Pending before the Court is a discovery dispute concerning Vocus' responses to two of NVP's Requests for Admissions ("RFAs"). Joint Letter ("Jt. Ltr."), Dkt. No. 108.[1] Having considered the parties' positions, relevant legal authority, and the record in this case, the Court issues the following Order.

## BACKGROUND

**A.  Factual Background**

NVP owned software known as "North Social," which effectively "mined" Facebook for business marketing purposes. SAC ¶ 1; Jt. Ltr. at 1. On February 24, 2011, NVP and Vocus entered into the Agreement, in which NVP sold the North Social software and other assets to Vocus. SAC ¶ 5; Jt. Ltr. at 1, 3; Agmt. §§ 1.01, 1.06. In essence, the Agreement provided that

---

[1] The parties filed two Joint Discovery Letters, the first on March 3, 2016 (Dkt. No. 103) and the second on March 8, 2016 (Dkt. No. 108). Both letters concern the same dispute and the parties' arguments are the same; the March 8 letter only adds that the parties met and conferred prior to filing the letter and could not resolve the dispute. Dkt. No. 108 at 1.

Vocus would pay NVP a base price of $7 million (the "Purchase Price"), plus additional payments on top of the Purchase Price if North Social's business[2] met certain revenue and margin-based performance goals over the next two years. Jt. Ltr. at 2-3; Agmt. §1.08; SAC ¶ 6.

Specifically, under the Agreement's earn-out provision, Vocus is required to pay NVP up to an additional $18 million over a period of two years through four structured payment installments, or "tiers," if North Social met certain revenue criteria. SAC ¶ 6, Jt. Ltr. at 1-3; Agmt. § 1.08(a). At the end of each calendar month, Vocus provided NVP with a "Run Rate Report" calculating the Monthly Run Rate[3] for the prior month and indicating whether those criteria had been satisfied. Agmt. § 1.08(b). If so, Vocus would pay NVP the applicable earn-out amounts. *Id.* Pursuant to the Agreement, the Purchase Price would be increased as follows:

> (i) The earliest date on which for the first time both the First Tier Criteria and the EBITDA Margin Requirement are satisfied, the Purchase Price shall be increased by an additional $3,000,000 (the "First Tier Earn-Out Amount").
>
> (ii) The earliest date on which for the first time both the Second Tier Criteria and the EBITDA Margin Requirement are satisfied, the Purchase Price shall be increased by an additional $4,000,000 (the "Second Tier Earn-Out Amount").
>
> (iii) The earliest date on which for the first time both the Third Tier Criteria and the EBITDA Margin Requirement are satisfied, the Purchase Price shall be increased by an additional $5,000,000 (the "Third Tier Earn-Out Amount").
>
> (iv) The earliest date on which for the first time both the Fourth Tier Criteria and the EBITDA Margin Requirement are satisfied, the Purchase Price shall be increased by $6,000,000 (the "Fourth Tier Earn-Out Amount")[.]

*Id.* § 1.08(a)(1)(i)-(iv); *see* Jt. Ltr. at 2-3. Additionally, "[i]f the First Tier Earn-Out Amount shall have accrued during the Earn-Out Period, but the Fourth Tier Earn-Out Amount shall not have accrued during the Earn-Out Period, the Purchase Price shall be increased by the Pro-Rated Earn-

---

[2] During this two-year period, NVP retained control over the day-to-day management and operations of the business. SAC ¶ 11.

[3] The terms "Monthly Run Rate," "Tier Criteria," and "EBITDA Margin Requirement" are not defined in the Agreement. The RFAs indicate, however, that they are defined in Exhibit A to the Agreement, which contains Definitions and Rules of Construction. *See* Agmt. at Table of Contents. Because the parties did not attach Exhibit A to the Letter or the SAC, the Court's interpretation of these terms is based on the parties' descriptions in their Joint Letter.

Out Amount, if any[.]" *Id.* § 1.08(a)(v).

NVP asserts a claim of breach of contract and seeks declaratory relief and accounting. SAC ¶¶ 21-27. NVP alleges Vocus improperly allocated revenue derived from sales of the North Social software, which in turn ultimately reduced the amounts Vocus owed NVP under the earn-out provision of the Agreement. *Id.* ¶ 12. As a result, NVP alleges Vocus owes, but refuses to pay, NVP at least $6,441,473 in earn-out payments. *Id.* ¶ 13.

On July 7, 2015, the presiding judge in this matter, the Honorable Richard Seeborg, appointed Basil Imbrugia as Special Master pursuant to Federal Rule of Civil Procedure 53. Dkt. No. 64 (Order appointing Basil Imbrugia as Special Master). The Court tasked the Special Master with "determin[ing] the amount of revenue that should be recognized for purposes of determining the amount of additional earn-out due Plaintiff, if any, based upon the Asset Purchase Agreement dated February 24, 2011." Dkt. No. 58 (Stipulation and Order to Appoint Special Master, "Stip. & Order"). The Special Master issued his report on January 11, 2016 and provided an update in a letter dated January 26, 2016. *See* Jt. Ltr., Ex. 1 (the parties' selected portions of the Special Master's Report and Update, hereafter the "Special Master Report"). Relevant to this dispute is the Special Master's calculation that the February 2013 Monthly Run Rate was $760,749.[4] Jt. Ltr. at 2, 4; Special Master Report at 8.

**B.     Discovery at Issue**

NVP asserts Vocus failed to answer NVP's RFA Nos. 1 and 2. Jt. Ltr. at 5-6. RFA No. 1 asks Vocus to

> Please admit that the Third Tier Criteria ("the Monthly Run Rate equals or exceeds $750,000"), as defined in Exhibit A to the FEBRUARY 24, 2011 ASSET PURCHASE AGREEMENT (the Definitions and Rules of Construction), was met during the month of February 2013. (The "FEBRUARY 24, 2011 ASSET PURCHASE AGREEMENT" is that Agreement by which VOCUS, INC. purchased assets held by Plaintiff.)

---

[4] The Special Master originally calculated the February 2013 Monthly Run Rate to be $757,014. Special Master Report at 5. After he submitted his Report, NVP's counsel provided him with additional information regarding certain contracts. *Id.* at 6. Taking this information into account, the Special Master deemed it necessary to adjust the February 2013 Monthly Run Rate by $3,660.97 for a new rate of $760,749. *Id.* at 6-7.

3

*Id*. at 4. Vocus responded: "Vocus admits that, per the January 26, 2016 Updated Report of the Special Master, the Monthly Run Rate in February 2013, for purposes of ¶ 11.a of the Stipulated Order Appointing Special Master, was $760,749."[5] *Id.* Vocus contends this is a proper response to the Request. *Id.* at 6.

RFA No. 2 asks Vocus to

> Please admit that at least a portion of the Fourth Tier Criteria ("the Monthly Run Rate equals or exceeds $1,000,000"), as defined in Exhibit A to the FEBRUARY 24, 2011 ASSET PURCHASE AGREEMENT (the Definitions and Rules of Construction), was met during the month of February 2013. (The "FEBRUARY 24, 2011 ASSET PURCHASE AGREEMENT" is that Agreement by which VOCUS, INC. purchased assets held by Plaintiff.)

*Id.* at 4. Vocus argues the phrasing of RFA No. 2 makes it unclear as to whether Vocus should admit or deny the Request. *Id.* at 6. Vocus thus qualified its response, stating that

> Vocus objects to this Request on the grounds that the phrase "a portion of the Fourth Tier Criteria" is vague and ambiguous. Subject to and without waiving the foregoing objection, Vocus responds as follows:
> Vocus admits that, per the January 26, 2016 Updated Report of the Special Master, the Monthly Run Rate in February 2013, for purposes of ¶ 11.a of the Stipulated Order Appointing Special Master, was $760,749.

*Id.* at 4.

---

[5] Paragraph 11.a of the Stipulation and Order to Appoint Special Master provides that the Special Master will make a determination as to

> [t]he amount of revenue that should have been recognized on a monthly basis for purposes of calculating the Earn-Out referenced in the Asset Purchase Agreement ("Earn-Out Revenue"). The computations should, to the extent possible, separately set forth: (i) revenue on North Social sales of North Social products; (ii) revenue on North Social sales of North Social services; (iii) revenue on Vocus sales of North Social products as standalone products; (iv) revenue on Vocus sales of North Social products as part of another product or suite of products; and (v) revenue on Vocus sales of North Social services. Any dispute regarding whether any of the foregoing five (5) categories of revenue are contractually required to be included in the Earn-Out calculation under the Asset Purchase Agreement shall be decided by the Court. The Parties acknowledge that for revenue referenced above in paragraphs 11(a)(i) and 11(a)(ii) it may not be possible to fully separate revenue into the two listed categories.

Stip. & Order at 3-4.

1   NVP contends Vocus failed to answer both RFAs and instead simply rephrased the questions and admitted what the Special Master found in his report. *Id.* at 5. NVP claims that while Vocus admits the Special Master's findings are final and conclusive, Vocus refuses to admit or deny the actual conclusion of those findings. *Id.*

Vocus is "unclear [as to] why NVP takes issue with Vocus' responses[.]" *Id.* Vocus argues it "properly admitted what the Special Master specifically found with respect to North Social's performance in February 2013—namely, that the Monthly Run Rate in February 2013 was $760,749" and that "[t]his is a fair, good faith, substantive, and proper response to the substance of [NVP's] requests." *Id.* at 5-6. Vocus further contends that both RFA Nos. 1 and 2 "do not seek to eliminate issues for trial, but rather, seek to expand them." *Id.* at 6.

## LEGAL STANDARD

Federal Rule of Civil Procedure 36 provides that "[a] party may serve on any other party a written request to admit . . . the truth of any matters within the scope of Rule 26(b)(1) relating to . . . facts, the application of law to fact, or opinions about either[.]" Fed. R. Civ. P. 36(a)(1). The scope of Rule 26(b)(1) provides that matters "that [are] relevant to any party's claim or defense and proportional to the needs of the case" are discoverable.

If a responding party does not admit a matter, the party "must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it." Fed. R. Civ. P. 36(a)(4). "[W]hen good faith requires that a party qualify an answer or deny only a part of a matter, the answer must specify the part admitted and qualify or deny the rest." *Id.*

"If a party contends that the response to the request for admission does not comply with Rule 36(a), then the party may 'move to determine the sufficiency of an answer or objection.'" *U.S. ex rel. Strom v. Scios, Inc.*, 2011 WL 5444248, at *1 (N.D. Cal. Nov. 9, 2011) (quoting Fed. R. Civ. P. 36(a)(6)). A court that finds an answer does not comply with the Rule "may order either that the matter is admitted or that an amended answer be served." Fed. R. Civ. P. 36(a)(6).

## DISCUSSION

At first glance, Vocus' response seems to address the question in RFA No. 1—citing the Special Master's report, Vocus provides the February 2013 Monthly Run Rate as the Special

5

Master calculated it. But upon closer inspection, it becomes apparent that Vocus' response is not as "substantive and proper" as it contends. Vocus does not actually admit or deny that the February 2013 Monthly Run Rate satisfies the Third Tier Criteria but instead qualifies its answer by stating the Monthly Run Rate figure is "per the January 26, 2016 Updated Report of the Special Master" and is only calculated "for purposes of ¶ 11.a of the Stipulated Order Appointing Special Master[.]" *See* Jt. Ltr. at 4. Vocus made the same sort of qualifications about the Special Master's findings in its response to RFA No. 2. *Id.*

It is unclear why Vocus felt it necessary to include these qualifications about what the Special Master found. As NVP points out, if Vocus challenges the Special Master's findings, it can deny the request. *See id.* at 5. If it does not, it should simply admit the answer without such qualifications. In other words, by repeating the Special Master's calculations, Vocus sidesteps the main inquiry of the RFAs, which seeks *Vocus'* positions on the Third and Fourth Tier Criteria and whether they were met—not an admission of the Special Master's findings.

While Vocus argues its "qualified answer is appropriate to 'mitigate [any] unfair and unwarranted inferences' that could come from responding to this request, which stands alone and without reference to the Special Master Proceeding[,]" it does not explain what unfair or unwarranted inferences could be made from Vocus responding without these qualifications. *See* Jt. Ltr. at 6 (citing *Collins v. JC Penney Life Ins. Co.*, 2003 WL 25945842, at *11 (S.D. Cal. May 6, 2003) (explaining that qualified admissions are appropriate where request "stand[s] alone out of context of the whole truth" and could "convey[s] unwarranted and unfair inferences") (citing *Flanders v. Claydon*, 115 F.R.D. 70, 71-72 (D. Mass. 1987))). In *Collins*, for instance, if the defendant life insurance company admitted the request about the number of claims it received but did not pay and submitted this statistic without any context (i.e., "coverage analysis of each and every claim"), that statistic alone about the rate of non-payment would be "misleading and prejudicial" to the insurance company. *Id.* The *Collins* court thus appears to have allowed the insurance company to make qualified responses to provide some context to its response. *Id.* Vocus has not articulated why its complete response to RFA No. 1 would be misleading or unduly prejudicial to it. Nor has it explained how the Special Master's findings lend such significant

6

context to its response that without reference to those findings Vocus' response would convey unwarranted or unfair inferences.

Vocus has provided no reason why it cannot respond to RFA No. 1 without relying on the Special Master's findings, and the Court can discern no reason why it should not otherwise be required to respond. Indeed, requests seeking the admission of such underlying facts are proper under Rule 36. *See Music Grp. Macao Commercial Offshore Ltd. v. Foote*, 2015 WL 579688, at *2 (N.D. Cal. Feb. 11, 2015) (RFAs that "request underlying facts that may establish that the act was illegal . . . may well be appropriate RFAs."); *Benson Tower Condo. Owners Assoc. v. Victaulic Co.*, 105 F. Supp. 3d 1184, 1196 (D. Or. 2015) (RFA requests that "specifically request the admission of underlying facts that may be used to establish that the [defendant's] products were defective . . . may well [be] appropriate RFAs."). Moreover, an admission that the Third Tier Criteria had been met would eliminate the issue for trial. *See Asea, Inc. v. S. Pac. Transp. Co.*, 669 F.2d 1242, 1245 (9th Cir. 1981) ("The purpose of Rule 36(a) is to expedite trial by establishing certain material facts as true and thus narrowing the range of issues for trial."). Accordingly, Vocus should amend its response to RFA No. 1 consistent with this Order.

As to RFA No. 2, the Court finds that Vocus' answer to RFA No. 1 will determine the sufficiency of its answer to this additional request. Specifically, the Fourth Tier Criteria, whether in part or in whole, cannot be met if the Third Tier Criteria are not first satisfied, and thus Vocus' response to RFA No. 2 is necessarily dependent on its answer to RFA No. 1.

Given the foregoing, the Court finds the information NVP seeks is discoverable and Vocus' current response is insufficient. Accordingly, the Court ORDERS Vocus to amend its answer to RFA No. 1 to either deny the request or provide a complete and unqualified response and to amend its answer RFA No. 2 in accordance with its response to RFA No. 1.

//
//
//
//
//

**CONCLUSION**

In light of the preceding analysis, the Court **GRANTS** NVP's motion to compel further responses to RFA Nos. 1 and 2. Vocus shall provide complete responses to these RFAs in accordance with this Order **by March 24, 2016**.

**IT IS SO ORDERED.**

Dated: March 17, 2016

MARIA-ELENA JAMES
United States Magistrate Judge