UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORTH VENTURE PARTNERS, LLC,<br><br>Plaintiff/Counter-Defendant,<br><br>v.<br><br>VOCUS, INC.,<br><br>Defendant/Counter-Claimant. | Case No. 14-cv-00337-RS<br><br>**ORDER DENYING NORTH VENTURE PARTNERS' MOTION FOR SUMMARY JUDGMENT AND GRANTING VOCUS'S MOTION FOR LEAVE TO AMEND ADMISSIONS** |

## I.    INTRODUCTION

This action arises from an agreement between plaintiff/counter-defendant North Venture Partners, LLC ("NVP"), and defendant/counter-claimant Vocus, Inc., to acquire NVP's software platform North Social. In exchange for North Social, Vocus agreed to pay NVP a lump sum and earn-out payments, provided NVP satisfied two criteria—the "Monthly Run Rate" and the "EBITDA Margin Requirement." The asset purchase agreement ("APA") defined both terms.

Dissatisfied with Vocus's calculation of the earn-out payments, NVP filed this lawsuit. Throughout most of the action the parties agreed that NVP had satisfied the EBITDA Margin Requirement. Indeed, Vocus admitted as much in its responses to NVP's requests for admission. While preparing to submit certain accounting issues to a special master, however, Vocus's expert discovered that it had calculated the EBITDA inaccurately, resulting in significant overpayment. Armed with this new information, Vocus successfully sought leave to add counterclaims for unjust enrichment and money had and received. NVP now moves for entry of summary judgment with

respect to those two counterclaims, relying upon Vocus's prior admissions, among other evidence. Vocus moves for leave to withdraw these admissions. Because Vocus has demonstrated that withdrawal of its three prior admissions will facilitate the presentation of its counterclaims, and NVP has not shown that withdrawal will prejudice its ability to defend against the claims at trial, Vocus is granted leave to withdraw the admissions.

In its motion for summary judgment, NVP contends (1) that the APA's definition of "EBITDA Margin Requirement" is unambiguous; (2) that Vocus's judicially binding admissions doom its counterclaims; (3) that equitable estoppel bars the counterclaims; and (4) that Vocus waived its right to challenge NVP's satisfaction of the EBITDA Margin Requirement. None of these arguments is persuasive. Because both NVP and Vocus offer reasonable interpretations the APA is ambiguous, and a reasonable fact finder could decide in either party's favor, summary judgment is inappropriate. Moreover, none of Vocus's other evidence undercuts the viability of the counterclaims. Finally, NVP has failed to establish that it relied upon Vocus's representations to its detriment or that Vocus intentionally and knowingly relinquished its right to contest the interpretation of the EBITDA Margin Requirement. Accordingly, NVP's motion for summary judgment must be denied.

## II.   FACTS AND PROCEDURAL HISTORY

### A. Vocus Acquires NVP's North Social Platform

NVP creates and promotes social media software and business services. In 2010, NVP founded North Social, a separate division of NVP, which promoted a suite of Facebook Fan Page applications and services for purchase, download, and installation. Bernstein Decl. ¶ 2. In 2011, to acquire North Social, Vocus agreed to pay NVP $7,000,000, plus up to $18,000,000 in earn-out payments, provided North Social achieved certain performance and profitability targets delineated into four "tiers."

During the earn-out period between 2011 and 2013, Vocus paid NVP for achieving tiers 1 and 2, but only a pro rata share of the full sum available for satisfying the criteria of tier 3. According to Vocus's calculations, NVP never achieved the requirements to receive the $6 million

payment under tier 4.  NVP objected to this pro rata installment and demanded payment of the full $18,000,000, arguing that it had satisfied the requirements for all four tiers.  When Vocus refused to pay, NVP filed this action.

### B. The Special Master's Involvement[1]

To facilitate adjudication of NVP's claims, the parties agreed to submit to a special master certain accounting issues arising from the earn-out computation.  Both parties hired accounting experts and submitted reports to the special master, who conducted a live hearing.  While preparing for the hearing with the special master, Vocus's accounting expert, Matthew Bialecki, discovered that Vocus had calculated the EBITDA Margin inaccurately throughout the earn-out period based on his interpretation of the APA.  As a result of this error, Vocus may have overpaid NVP.  Soon after this discovery, Vocus sought and was granted leave to file counterclaims against NVP for unjust enrichment and money had and received.

### C. The Relevant Terms of the APA

Vocus's counterclaims revolve around how properly to interpret the APA's definition of the "EBITDA Margin Requirement."  Pursuant to the APA, NVP had to satisfy two criteria to be eligible to receive earn-out payments.  First, NVP had to hit certain revenue targets ("Monthly Run Rates") during the twenty-four-month period between February 24, 2011, and February 28, 2013. Rudman Decl. Ex. 14, APA §§ 1.06, 1.08.  The "Monthly Run Rate" refers to "the monthly Revenue from the Business for any calendar month during the Earn-Out Period."  APA at A-6.  Under the four-tiered system, NVP had to achieve the following Monthly Run Rate milestones: $250,000 (Tier 1); $500,000 (Tier 2); $750,000 (Tier 3); and $1 million (Tier 4).  Second, NVP had to satisfy the "EBITDA Margin Requirement."  The parties agreed to define the term "EBITDA Margin Requirement" as follows:

---

[1] Vocus has objected to numerous statements in the reply declaration of NVP counsel Rod Divelbiss, who accuses Vocus of bad faith and submitting fraudulent or "seriously flawed" accounting methods to the special master.  Divelbiss has not offered foundation for these opinions, nor are they appropriate. *See* Fed. R. Evid. 602, 701.  Accordingly, Vocus's objections are sustained.

"EBITDA Margin Requirement" means that for the period commencing on the Closing Date and ending on the last day of a calendar month that the First Tier Criteria, Second Tier Criteria, Third Tier Criteria or Fourth Tier Criteria is satisfied, or the end of the Earn-Out Period[2] (each a "Margin Period"), the Owner's[3] cumulative earnings before interest, taxes, depreciation and amortization of the Business[4] for the applicable Margin Period ("the EBITDA"), divided by the cumulative Revenue of the Business for such Margin Period, all as determined in accordance with GAAP,[5] is greater than or equal to 15%. For purposes of this definition (a) Owner shall be treated as an unaffiliated, stand-alone entity and Buyer[6] and its Affiliates shall not allocate any of their expenses or other deductions to Owner (including, without limitation, any of their management or administrative overhead expenses); (b) Revenue recognized by Buyer for sales of Owner's products or services conducted by Buyer or its Affiliates (other than Owner) shall be included in calculating both EBTIDA and the Monthly Run Rate; (c) a sales commission (regardless of whether such amount is paid) equal to thirty-five percent (35%) of such Buyer-generated Revenue shall be included in calculating EBITDA; and (d) the following expenses shall be excluded in determining EBITDA: (i) the first $200,000 of marketing expenses incurred by Owner during the Earn-Out period; (ii) any expenses or liabilities of Owner which shall be paid by Seller or Members pursuant to Section 6.02(a); and (iii) all travel related expenses incurred by Members or Owner for travel to Buyer's headquarters or for travel required by Buyer in writing, but only to the extent that such expenses are permitted by Buyer's travel policies. Notwithstanding anything in this Agreement to the contrary, if both Members are no longer employed by Owner for any reason whatsoever, then the EBITDA Margin Requirement for all purposes under this Agreement shall be deemed satisfied for all Margin Periods and other time periods occurring on or after the date that the last of the Members ceases to be employed by the Owner.

APA at A-3-4. The EBITDA Margin Requirement for a certain Margin Period would be expressed mathematically thus:

$$\text{EBITDA Margin Requirement} = \frac{EBITDA}{Revenue}$$

---

[2] The APA defines the "Earn-Out Period" as the twenty-four month period following the closing date. APA at A-3.

[3] "Owner" refers to North Social Apps, LLC, which was formed to operate North Social after closing. APA § 1.09.

[4] The APA defines "the Business" as "an online platform that enables subscribers to purchase and install a suite of Facebook Fan Page applications and certain services in connection with such applications." APA at 009.

[5] "GAAP" means the United States generally accepted accounting principles. APA at A-4.

[6] Under the APA Vocus is "the Buyer." APA at 009.

The term "earnings" is undefined, whereas the APA defines "Revenue"[7] as follows:

> [T]he revenue of the Business, determined in accordance with GAAP, *provided, however,* that the term 'Revenue' shall exclude any amounts received from a single customer (including its Affiliates) to the extent that such amounts exceed two percent (2%) of the total monthly Revenue for such one-month period; and Revenue received from a single customer shall include only amounts charged to a single-credit card for the customer or invoiced to the customer.

APA at A-6 (emphasis in original).

Throughout the earn-out period, Vocus used gross revenue, rather than the defined term "Revenue," to calculate EBITDA. Vocus also used gross revenue as the denominator when calculating the EBITDA Margin Requirement.

Both parties now dispute whether gross revenue, without the two-percent limitation, should have been used in both the nominator and the denominator of the EBITDA Margin Requirement equation. NVP contends that "earnings" means gross revenue, and therefore Vocus properly used gross revenue when calculating EBITDA. However, NVP also argues that Vocus erred by using gross revenue instead of "Revenue" as the denominator of the EBITDA Margin Requirement equation.

In contrast, Vocus argues that the defined term "Revenue," with the two-percent limitation, should have been used to calculate EBITDA, and also as the denominator in the EBITDA margin Requirement equation. *See* Bialecki Decl. ¶ 3. The difference between these formulas is consequential: applying Bialecki's formula, NVP never satisfied the EBITDA Margin Requirement after December 2011. *Id.* ¶¶ 4-5. This asserted error, according to Vocus, caused it to overpay NVP $8,558,537. *Id.* ¶¶ 3-11.

**D. Vocus's Run Rate Reports**

Throughout the earn-out period, the APA obligated Vocus to provide NVP with "Run Rate Reports," which calculated the Monthly Run Rate for the prior month. Bernstein Decl. ¶ 15.

---

[7] Throughout this order, "Revenue" refers to the term defined by the APA, whereas "revenue" will mean gross revenue.

1  When Vocus notified NVP that it was not on target to achieve the margin requirement, NVP made
2  efforts to decrease expenses and to increase revenues. *See* Bernstein Decl. ¶¶ 8-11, 16.  Vocus
3  never used "Revenue" to calculate the EBITDA Margin Requirement throughout the earn-out
4  period, which meant NVP never had any indication that Vocus might have been calculating the
5  EBITDA Margin Requirement incorrectly.  Vocus was also ignorant of this alleged error until
6  September 2015.  Sklaire Decl. ¶¶ 2-3, Ex. 1.

**E.  Vocus's Responses to NVP's Requests for Admissions**

In November 2014, after this litigation commenced, NVP served Vocus with requests for admissions pursuant to Federal Rule of Civil Procedure 36, which included the following requests:

> <u>Request for Admission No. 2:</u>  "Please admit that on the date the Second Tier Requirement for payment of the earn-out under the [APA] was met, the EBITDA Margin Requirement was also satisfied."
>
> <u>Request for Admission No. 3:</u>  "Please admit that on the date the Third Tier Requirement for payment of the earn-out under the [APA] was met, the EBITDA Margin Requirement was also satisfied."
>
> <u>Request for Admission No. 4:</u>  "Please admit that on the date the Fourth Tier Requirement for payment of the earn-out under the [APA] was met, the EBITDA Margin Requirement was also satisfied."

Sklaire Decl. Ex. 3, Vocus's Responses to NVP's RFAs Set 2.  Vocus served admissions to the second and third requests, and stated that it was unable to admit or to deny the fourth.  *Id.*  Vocus now seeks leave to withdraw these three admissions and to amend its responses.

### III.  LEGAL STANDARD

Litigating parties may employ requests for admission "relating to . . . facts, the application of law to fact, or opinions about either." Fed. R. Civ. P. 36(a).  Requests for admission "serve two important goals:  truthseeking in litigation and efficiency in dispensing justice." *Conlon v. United States*, 474 F.3d 616, 622 (9th Cir. 2007) (citing Fed. R. Civ. P. 36 advisory committee's note).  An admission has the effect of "conclusively establish[ing]" the matter admitted "unless the court,

ORDER GRANTING MOTION FOR LEAVE TO WITHDRAW ADMISSIONS AND DENYING MOTION FOR SUMMARY JUDGMENT
CASE NO. 14-cv-00337-RS
6

on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b).

Rule 36(b), which is "permissive, not mandatory," allows district courts to grant requests to withdraw or to amend admissions only when the moving party demonstrates (1) that withdrawal of the admission "would promote the presentation of the merits of the action," and (2) that withdrawal will not prejudice the party that obtained the admission "in maintaining or defending the action on the merits." Fed. R. Civ. P. 36(b); *Conlon*, 474 F.3d at 621. A party satisfies the first criterion by showing that "upholding the admissions would practically eliminate any presentation of the merits of the case." *Conlon*, 474 F.3d at 622 (internal quotation marks omitted). The party objecting to withdrawal of an admission bears the burden of proving that withdrawal would prejudice its presentation of the evidence at trial. *Hadley v. United States*, 45 F.3d 1345, 1348 (9th Cir. 1995). Inconvenience or "reliance on a deemed admission in preparing a summary judgment motion" do not constitute prejudice. *Conlon*, 474 F.3d at 623-24.

A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party who seeks summary judgment bears the initial responsibility of identifying an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies this initial burden, the non-moving party must present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. "Only disputes over facts that might affect the outcome of the suit under governing law" are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue exists if the non-moving party presents evidence from which a reasonable fact-finder, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Id.* at 248-49.

### IV.   DISCUSSION

**A. NVP's Motion to Withdraw Admissions**

*1. The Scheduling Order*

NVP insists that Vocus's present motion for leave to withdraw the admission is a pretrial

motion, which the scheduling order required to be heard by March 3, 2016. Dkt. 82. Vocus noticed its motion to withdraw admissions for March 17—two weeks after the scheduled deadline. According to NVP, to be heard on the present motion, Vocus must demonstrate "good cause" to amend the scheduling order. *See* Fed. R. Civ. P. 16(b)(4). NVP ignores, however, that the scheduling order quite clearly refers to *dispositive* pretrial motions (i.e., motions for summary judgment or judgment on the pleadings), which Vocus's pending motion is not. Accordingly, although Vocus has offered no excuse for its failure to file this motion sooner, it is not required to demonstrate "good cause" to alter the scheduling order.[8]

### 2. *Presentation of the Claims on the Merits*

Vocus's counterclaims rest on whether NVP satisfied the EBITDA Margin Requirement, and therefore the admissions Vocus seeks to withdraw undercut its counterclaims entirely. At this point, Vocus has shown that it was genuinely mistaken when it responded to the requests for admission. Holding Vocus to its previous answers would not promote the adjudication of Vocus's claims on the merits because doing so would eviscerate the counterclaims completely. *See Hadley*, 45 F.3d at 1348 (concluding the first prong of Rule 36(b)'s test is satisfied if denial of the request to withdraw would prejudice the moving party's case); *Medina v. Donahoe*, 854 F. Supp. 2d 733, 748-49 (N.D. Cal. 2012) ("Where . . . the admissions go directly to the ultimate questions at issue in this case, the presentation of the merits in this action would be subserved if defendant were allowed to prevail on the matters deemed to be admitted under Rule 36." (internal quotation marks and alteration omitted)). Because civil litigation should not be a game of "gotcha" and the prior admissions would prejudice its case, Vocus has satisfied the first requirement of Rule 36(b).

### 3. *Prejudice*

While the tardiness of Vocus's request for leave to withdraw the admission is troubling, NVP bears the burden to demonstrate that it will be prejudiced if Vocus's request to withdraw the

---

[8] NVP's supplemental argument about the meaning of this court's very own scheduling order is unconvincing. NVP's request for further oral argument on this issue is denied.

ORDER GRANTING MOTION FOR LEAVE TO WITHDRAW ADMISSIONS AND DENYING MOTION FOR SUMMARY JUDGMENT
CASE NO. 14-cv-00337-RS
8

admissions is granted. It has not done so. To start, NVP has been aware for months that Vocus now challenges both parties' long-held belief that NVP satisfied the EBITDA Margin Requirement. In September 2015, Vocus sought leave to add counterclaims, which NVP opposed. Dkt. 65, 70. In December 2015, NVP moved to dismiss Vocus's claim for unjust enrichment, as well. Dkt. No. 85. NVP cannot therefore credibly claim surprise at Vocus's current request to withdraw the admissions that undermine the counterclaims it fought vigorously to preserve.

For similar reasons, NVP's claim that its experts have not or could not reanalyze the EBITDA Margin Requirement is insufficient to establish prejudice. NVP has had six months to address Vocus's counterclaims, and, indeed, NVP has already retained Gregory Halm[9] to perform such calculations. *See* Halm Decl. ISO MSJ. To the extent NVP lacks information necessary to recalculate the EBITDA Margin Requirement, the parties are instructed to continue to work together to ensure both sides have all information necessary to adjudicate these counterclaims on the merits at trial.

NVP also insists that it will need to notice additional depositions or to redepose some of Vocus's employees if the request to withdraw the admissions is granted. NVP has not adequately explained, however, the basis for that assessment or why it had not sought leave to do so shortly after Vocus was granted leave to file counterclaims. To begin, Vocus and its employees have consistently testified that they were unaware of their miscalculation of the EBITDA Margin Requirement. NVP has not identified how additional depositions or redeposing certain witnesses will further its defense to the counterclaims when Vocus does not contest that its methods then and now are different. If NVP wishes to conduct additional depositions or to redepose witnesses, it should work with Vocus to ensure that happens. The mere hope NVP might uncover new information does not, however, amount to prejudice.[10]

---

[9] Vocus initially objected to Halm's declaration in support of NVP's motion for summary judgment on the basis that NVP had not included Halm in its expert disclosures due February 16, 2016. At the hearing on the motion, Vocus formally withdrew that objection.

[10] NVP also claims prejudice by way of certain strategic decisions it made, such as agreeing to vacate an earlier trial date, on the assumption that Vocus would not seek to withdraw its

In sum, despite the tardiness of Vocus's motion and inability to provide a good reason for its delay, NVP has not shown that withdrawal of these admissions will prejudice its trial presentation. While lawyers should strive to avoid such oversight, forcing Vocus to adhere to its prior admissions does not serve truthseeking or judicial efficiency. Accordingly, Vocus's request to withdraw its responses to NVP's requests for admission 2-4 must be granted.

### B. Construction of the Term "EBITDA Margin Requirement"

Because the parties agree that Maryland law governs interpretation of the APA, *see* APA § 7.06, Maryland's rules of contract interpretation determine whether Vocus or NVP has the better reading of the term "EBITDA Margin Requirement." Maryland employs an "objective theory of contract interpretation, giving effect to the clear terms of agreements, regardless of the intent of the parties at the time of contract formation." *Myers v. Kayhoe*, 892 A.2d 520, 526 (Md. 2006). When interpreting the terms of a contract, the first step is to "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant" at the time the contract went into effect, *id.* (internal quotation marks omitted), by examining "the entire language of the agreement, not merely a portion thereof," *Jones v. Hubbard*, 740 A.2d 1004, 1016 (1999); *see also Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993) (applying Maryland law). If the text of the contract is unambiguous, then there is no need to look to additional evidence about the parties' intent. *Goodman*, 7 F.3d at 1126. "A contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Jones*, 7 F.3d at 1126.

If a contract term is unambiguous, then the moving party is entitled to judgment as a matter of law. *Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007) (applying Maryland law). If a term is ambiguous, however, a court may turn to the second step—examination of extrinsic evidence—to resolve whether summary judgment is appropriate.

---

admissions. Such speculation regarding the impact of changing litigation positions does not rise to the level of a showing of prejudice.

*See id.* In the event extrinsic evidence "leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must . . . be refused and interpretation left to the trier of fact." *Goodman*, 7 F.3d at 1126 (internal quotation marks omitted).

To determine whether the language of the APA is unambiguous requires breaking down the definition of "EBITDA Margin Requirement" into its component parts. The EBITDA Margin Requirement is a ratio. The "EBITDA" is the numerator, which the APA defines as North Social's "cumulative earnings before interest, taxes, depreciation and amortization of the Business" during the applicable period of time. The denominator is "Revenue," as defined by the APA. Thus, the parties' decision to use two different words may be intentional and consequential. Indeed, the fact that the parties used "Revenue" and "earnings" in the same sentence bolsters NVP's position that the two terms are intentionally different. NVP contends that the Financial Accounting Standards Board's ("FASB") definition of "earnings" should inform the understanding of "earnings" as used in the APA because the FASB is part of GAAP to which the APA requires all calculations accord. Halm Decl. ¶ 6; APA at A-3. According to the NVP, "earnings" are "a measure of the entity performance during a period[, which] measures the extent to which asset inflows (revenues and gains) associated with cash-to-cash cycles substantially completed during the period exceed asset outflows (expenses and losses) associated, directly or indirectly with the same cycles." Halm Decl. ¶ 6. Thus, NVP's reasonable understanding of "earnings" comports with the generally accepted method for calculating EBITDA. *See* Halm Decl. ¶¶ 6-7.

Complicating matters are subparts (b) and (c), which further define those commissions to be included in the calculation of "EBITDA." Subpart (b) clarifies that "*Revenue* recognized by [Vocus] for sales of [North Social's] products and services conducted by [Vocus] or its Affiliates (other than [North Social])" must be included when calculating EBITDA. APA at A-4 (emphasis added). In addition, subpart (c) sweeps into the EBITDA calculation "sales commission[s] (regardless of whether such amount is paid) equal to thirty-five percent (35%) of such [Vocus]-generated *Revenue*." *Id.* (emphasis added). Vocus convincingly argues that these subparts imply

that "earnings" might actually mean "Revenue" because the APA does not offer any explanation as to why Vocus-generated earnings should be treated differently from earnings generated by North Social. These subparts therefore render the definition of "EBITDA Margin Requirement" ambiguous.

        The extrinsic evidence in the record does not definitively favor Vocus or NVP. Vocus has proffered evidence to suggest its interpretation of "EBITDA" is consistent with the parties' intent at the time they drafted the APA. According to Richard Rudman, Vocus's former Chairman of the Board, President, and CEO, Vocus insisted on the EBITDA Margin Requirement "because [it] wanted North Social to operate as a cost-effective and profitable business, and not simply to generate a high volume of sales without regard to profitability." Rudman Decl. ¶ 5. NVP's attorney who helped draft and negotiate the APA also agrees that the purpose of the two-percent limitation "was to assure the principals of NVP had an incentive during the two-year earn-out period to sign-up large numbers of customers and to assure that they did not attempt to earn the full earn-out payment under the APA by signing a few large revenue contracts and then leave the business before the end of the earn-out period." O'Neil Decl. ¶ 4. To that end, the parties agreed to exclude from the calculation of "Revenue" sums received from a single customer that exceeded two percent of North Social's total revenue. In other words, the purpose of this two-percent limitation was designed to ensure that NVP could not satisfy the earn-out requirements by securing one large contract. Rudman Decl. ¶¶ 6-7; Herrington Decl. Ex. 3, Vintz Dep. at 194:20-195:8.[11] Vocus contends that utilizing gross revenue as the nominator and "Revenue" as the denominator does not yield an accurate measure of profitability—a reasonable contention in these circumstances. Moreover, Vocus points out that it always calculated the EBITDA Margin Requirement using common terms in the nominator and the denominator (revenue instead of

---

[11] In reply, NVP submitted a declaration of NVP's attorney who helped draft the APA, John O'Neil. O'Neil offers facts about the drafting process and the parties' alleged intentions. *See* O'Neil Decl. ¶¶ 1-3. Vocus initially objected to this declaration, but withdrew the objection at the hearing.

"Revenue"), which supports its position that there must be some symmetry in the ratio to measure profitability accurately.

In contrast, NVP's owner, Alex Bernstein, states that he never believed the EBITDA Margin calculations would be subject to the two-percent limitation. Bernstein Decl. ¶ 5. That contention is difficult to square with NVP's current position that "Revenue" should serve as the denominator.[12] These competing versions of the contract negotiation create a genuine dispute of material fact as to whether the parties intended to incorporate the two-percent limitation into calculations of the EBITDA Margin Requirement. Accordingly, resolution of this dispute is not amenable to summary judgment.

### C. The Effect of Vocus's Non-Rule 36 Admissions

NVP further argues that Vocus cannot prevail because it and its employees have already made legally binding admissions. Because Vocus is granted leave to withdraw its Rule 36 admissions, NVP cannot rely on those as a basis to grant NVP summary judgment. NVP nonetheless argues that Vocus's answer to the SAC similarly undercuts its counterclaims. The second amended complaint states that Vocus "made certain payments as required by the [APA] but failed to make other required payments." SAC ¶ 9. In the answer, Vocus admitted "that it made certain payments as required by the [APA]." Ans. to SAC ¶ 9. According to NVP, this legally binding admission compels the conclusion that NVP satisfied the EBITDA Margin Requirement throughout the earn-out period. This response, however, is not the smoking gun NVP contends. Vocus's answer is similarly susceptible to the reading that Vocus paid NVP $7 million to acquire North Social, which it did. It could also mean that Vocus paid NVP the first tier

---

[12] NVP argues that Vocus's proffered equation produces an absurd result and does not sync with the purposes of the APA. To illustrate the point, NVP offers a hypothetical single sale. In a situation where NVP spent $90,000 to secure a contract worth $100,000, the two-percent limitation would operate to exclude all but $20,000 from NVP's gross revenue calculations. According to NVP, this would result in a margin of -350%. *See* NVP Reply at 8. The trouble with this hypothetical scenario is that NVP is focusing on a single sale rather than multiple sales over an extended period of time to track the profitability of North Social. Rudman Decl. ¶ 5. Thus, NVP's example pertaining to a single transaction is not necessarily absurd because it could have sought additional contracts to counteract the effects of the single negative margin.

ORDER GRANTING MOTION FOR LEAVE TO WITHDRAW ADMISSIONS AND DENYING MOTION FOR SUMMARY JUDGMENT
CASE NO. 14-cv-00337-RS
13

earn-out payments—a fact neither party disputes. Vocus has not, however, definitively admitted that NVP satisfied the EBITDA Margin Requirements.

Next, NVP insists admissions by a Vocus 30(b)(6) witness and a stipulation to submit accounting issues to the special master establish that NVP satisfied the EBITDA Margin Requirement during the relevant time period. Federal Rule of Civil Procedure 30(b)(6) permits a party to name as the deponent a corporation provided the party describes "with reasonable particularity" the subject matter for examination. The corporation must then designate a person to testify on its behalf. Fed. R. Civ. P. 30(b)(6). Such depositions produce evidence, but the 30(b)(6) deponent's testimony is not tantamount to a judicial admission. *Erickson v. Microaire Surgical Instruments LLC*, No. C08-5745BHS, 2010 WL 1881942, at *2 (W.D. Wash. May 6, 2010). NVP cannot therefore argue that Vocus is judicially bound by the testimony of its 30(b)(6) witness. If NVP wishes to probe the cause of Vocus's change in position, it may do so during cross-examination. Finally, the stipulation to engage the assistance of the special master includes no stipulations or admissions about NVP's satisfaction or failure to satisfy the EBITDA Margin Requirement. *See* Dkt. 58. Indeed, the stipulation does not even mention the EBITDA Margin Requirement. Accordingly, no judicial admission definitively establishes that NVP is entitled to summary judgment.

**D. Estoppel**

NVP seeks summary judgment for the additional reason that it believes Vocus is equitably estopped from challenging NVP's satisfaction of the EBITDA Margin Requirement. Equitable estoppel applies when a party's voluntary conduct precludes him or her "from asserting rights which might perhaps have otherwise existed . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse." *Knill v. Knill*, 510 A.2d 546, 549 (Md. 1986) (internal quotation marks omitted). To enjoy the benefits of equitable estoppel, NVP must prove (1) that Vocus's voluntary conduct or representation (2) caused NVP to rely on that conduct (3) to its detriment. *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 364 (Md. 2007); *see also Knill*, 510 A.2d at 550 ("[T]he party who relies on an

estoppel has the burden of proving the facts that create it.").

Indisputably, Vocus never used the two-percent limitation when calculating EBITDA; the record definitively establishes that point. This record does not, however, demonstrate that the only conclusion a fact finder could reach is that NVP relied upon Vocus's computations to its detriment. NVP points to various periods of time when Vocus informed NVP that it may not satisfy the EBITDA Margin Requirement. *See* Bernstein Decl. ¶ 10. When faced with the possibility of falling short, "NVP made substantial efforts" to reduce expenses and to increase revenues to meet the demands of the EBITDA Margin Requirement. Bernstein Decl. ¶ 9.d. In addition, Bernstein declares that he authorized additional expenses after he learned that North Social had satisfied the EBITDA Margin Requirement for a specific period of time. Bernstein Decl. ¶ 9.e. NVP's argument is, in other words, that it would have done everything possible to achieve the EBITDA Margin Requirement had it been aware of the proper calculation method.

NVP can only claim the benefits of equitable estoppel, however, if it refrained from taking certain actions to satisfy the EBITDA Margin Requirement using "Revenue" because Vocus continued to calculate EBITDA using gross revenue. *See Hill*, 936 A.2d at 364 (holding that plaintiff had not demonstrated detrimental reliance because she received $70,261.26 more at settlement than she otherwise would have received). Right now, NVP's evidence falls short of this mark. NVP has not identified which actions they would have taken to secure the right to demand payment under the APA. Accordingly, because there remains a genuine dispute about the proper definition of "EBITDA" and whether NVP detrimentally relied upon Vocus's erroneous calculation, the doctrine of equitable estoppel does not bar Vocus's counterclaims from advancing. At trial, NVP will have the opportunity to present a fulsome case for the application of equitable estoppel under these circumstances.

### E. Waiver

NVP's final argument in favor of summary judgment is that Vocus intentionally relinquished its known right to challenge NVP's satisfaction of the EBITDA Margin Requirement. *See Taylor v. Mandel*, 935 A.2d 671, 686 (Md. 2007) (defining "waiver"). "A party to a contract

waives its rights under that contract if it (1) intentionally continues performance under the contract after (2) learning of a breach." *MJ Harbor Hotel, LLC v. McCormick & Schmick Rest. Corp.*, 599 F. Supp. 2d 612, 621 (D. Md. 2009) (citing *Pumphrey v. Pelton*, 245 A.2d 301, 304 (Md. 1968)).

This record does not establish that Vocus waived its right to enforce the EBIDTA Margin Requirement. Indeed, the record definitively establishes that Vocus was initially ignorant of the calculating error. Ultimately, NVP may prove that Vocus did not, in fact, commit an accounting error. If Vocus's position is correct, however, then NVP cannot possibly show that Vocus knowingly and intentionally chose to use the wrong method for calculating EBITDA. NVP's motion for summary judgment must therefore be denied.

## V.   CONCLUSION

Vocus is granted leave to withdraw its responses to NVP's requests for admission 2, 3, and 4. NVP has failed to demonstrate that no reasonable fact finder could find for Vocus with respect to its claims of unjust enrichment or money had and received. Its motion for summary judgment must therefore be denied. Trial of this action will take place July 25-27, 2016, and then will resume August 2 and continue as necessary.

**IT IS SO ORDERED**.

Dated: March 22, 2016

_____
RICHARD SEEBORG
United States District Judge